**TODD DRY DOCKS, Inc., et al. v. MAR-SHALL, Deputy Com'r, et al.**

No. 6915.

Circuit Court of Appeals, Ninth Circuit.
Nov. 7, 1932.

J. Speed Smith and Henry Elliott, Jr., both of Seattle, Wash., for appellants.

Anthony Savage, U. S. Atty., and Jeffrey Heiman, Asst. U. S. Atty., both of Seattle, Wash., for appellee Marshall.

James C. McKnight, of Seattle, Wash., for appellee Pittson.

Before WILBUR and SAWTELLE, Circuit Judges.

WILBUR, Circuit Judge.

This is an action to review the award of the appellee deputy commissioner in favor of the widow and minor child of Edward Pittson, who died March 28, 1929, of cerebrospinal meningitis, alleged to have been contracted while he was employed as a pipe fitter on the President Madison, which arrived at Seattle March 11, 1929, with several cases of spinal meningitis on board which had developed in the steerage of the vessel during its voyage from the Philippine Islands. The decedent, in pursuance of his employment by the appellant, went on board the ship the day of arrival to put materials aboard and take some measurements. On that day the decedent and his companion were on the deck above the steerage passengers who were kept in their quarters. The next day the passengers were removed from the ship, and on Wednesday, March 13, the ship was fumigated. On Thursday, March 14, the workmen began on the repairs and alterations continuing until March 21. The decedent worked on board during this period, and on Thursday March 21 worked in the steerage a quarter of an hour, putting in a fire line, finishing at 3:45 p. m. The decedent attended a dance Saturday, March 23, and left at 2 a. m. Sunday March 24 by automobile for Salt Lake City. On the way he was tired and drowsy. He arrived at Salt Lake City Tuesday March 26, became ill the next day, and died of spinal meningitis on March 28.

This disease is contracted by inhaling an organism called meningococcus ejected from the nose and throat of carriers and infected persons. Dr. Robertson testified on that subject as follows: "So far as I know the germ does not live outside of human bodies or outside of human tissues. For instance, if an individual coughs or sneezes, little, fine particles of saliva will carry many of those germs out into the air, but they quickly perish because they do not survive readily outside of the human body. But a person in the neighborhood of this individual may inhale some of this atomized sputum and be-

come infected thereby. They don't necessarily get spinal meningitis, but the germ may continue to thrive upon the mucous membrane of the nose or throat for an indefinite period. Those are what we call carriers. Carriers are those that harbor the germ without actually suffering from the disease. Those carriers can transmit that disease to other persons, so that they themselves might not have it but the person to whom they transmit it may have the disease. Not all persons are susceptible to any particular infectious disease. * * * I don't think there is anything in any particular occupation—of the occupation itself, outside of the presence of some one who happened to have the disease or happened to be a carrier, that would transmit that disease to a well man."

■ The deputy commissioner decided that the decedent contracted the disease while working for the appellant aboard the President Madison, and that finding of fact is amply supported by the evidence and is not seriously questioned by the appellant and cannot be disturbed by us. Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. Ed. 598.

That the death resulted from the employment of the decedent on navigable waters of the United States is established, and the remaining question is whether the disease was the result of an injury (33 USCA § 903, subd. (a), within the meaning of the Longshoremen's and Harbor Workers' Compensation Act (chapter 509, 44 Stat. 1424, § 3, subd. a), which is defined in section 2, subd. 2, thereof (33 USCA § 902, subd. 2), as follows:

"The term 'injury' means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment."

■ That spinal meningitis is a disease resulting from infection, we understand, is not questioned by the appellant. Infection is defined in the New Standard Dictionary as "the communication of disease, as by the entrance of pathogenic germs into an organism in any manner, distinguished from contagion in which direct or indirect contact with a diseased individual is implied; as the malady spread by infection." Appellants state in their brief: "No one will gainsay

that 'infection as arises naturally out of such employment' would include infectious diseases contracted in the course of an employment." Their contention is that the infection must be an occupational one; that is, that the phrase of the section (33 USCA § 902, subd. (2) dealing with disease should be construed as though it read, "and such occupational diseases or [occupational] infection as arises naturally out of such employment." We see no reason for thus limiting the plain language of the act, nor is it at all clear that the suggested addition of the qualifying word "occupational" to the word "infection" would affect the result. Appellants state, "No one contends that cerebrospinal meningitis is an occupational disease." This, however, does not meet the situation at all. It is a fundamental canon of construction that all the words of a statute should be given some significance, and to hold that "occupational disease" and "infection" or "occupational infection" are synonymous would in effect strike out of the statute the words "or infection." It would seem clear that the injury which resulted in the death of the employee was either an "accidental" injury as defined by the act, or an infection arising naturally out of the employment.

The Appellate Court of Indiana, in dealing with the subject of disease as an injury by accident within the meaning of that phrase as used in the Workmen's Compensation Laws, in the case of United Paperboard Co. v. Lewis, 65 Ind. App. 356, 117 N. E. 276, 277, said:

The courts have also differed as to whether a disease following an employment should be considered an injury by accident within the meaning of such acts. In the various decisions on this subject it is generally recognized that diseases are of two classes: First, the so-called industrial or occupational diseases, which are the natural and reasonably to be expected results of a workman following a certain occupation for a considerable period of time; second, diseases which are the result of some unusual condition of the employment. The first class is illustrated by lead poisoning and the second by pneumonia following an enforced exposure. As a rule such industrial or occupational diseases are not considered as injuries by accident and in the absence of special statutory provision compensation is not allowed therefor. On the other hand, it is generally accepted that a disease, which is not the ordinary result of an employee's work, reason-

ably to be anticipated as a result of pursuing the same, but contracted as a direct result of unusual circumstances connected therewith, is to be considered an injury by accident, and comes within the provisions of acts providing for compensation for personal injury so caused."

If we accept the definitions thus suggested by the Appellate Court of Indiana, it follows that, if the "infection" was a result naturally and reasonably to be expected from the decedent's occupation, it was not compensable as an accidental injury, but it would follow also that it was an "occupational infection." On the other hand, if we assume it was not reasonably and naturally to be expected, the disease, thus resulting from "unusual circumstances," would be an "accidental" injury within the meaning of that term as defined by the Appellate Court of Indiana in the excerpt above quoted. We do not, however, wish to be understood as implying our acceptance of appellants' contention that the statute limits compensable infection to "occupational infection," except to the extent that such limitation is contained in the qualifying words of the statute, "infection as arises naturally out of such employment." We are satisfied that the death of the employee in the case at bar resulted from an infection arising naturally out of such employment, and that Congress employed the phrase under discussion to set at rest the question which had been considered by the courts as to whether or not such an infection was the result of an accident or was an accidental injury compensable under the workmen's compensation laws. Arquin v. Industrial Comm., 349 Ill. 220, 181 N. E. 613, decided June 24, 1932, where a hospital interne contracted meningitis. See, also, our decision in Sullivan Mining Co. v. Aschenbach, 33 F.(2d) 1, applying the Workmen's Compensation Law of Idaho to a case of a painter poisoned by carbon disulphide fumes from a paint thinner. See, also, Industrial Comm. v. Roth, 98 Ohio St. 34, 120 N. E. 172, 6 A. L. R. 1463, to the same effect as to fumes arising from hot paint.

The question is not concluded by the decisions of the New York courts, because the statute in the respects under consideration differs from the New York Compensation Law (Consol. Laws, c. 67), from which, in the main, our Longshoremen's and Harbor Workers' Act is taken.

Order affirmed.